WASHINGTON INJURY LAW
Janelle Bailey
JBailey@washingtoninjurylaw.com
1905 Queen Anne Avenue N, Suite 300
Seattle Washington 98109

Tom Kherkher (*pro hac vice application forthcoming*)
Jarrett Lee Ellzey (*pro hac vice application forthcoming*)
Leigh S. Montgomery (*pro hac vice application forthcoming*)
Tyler Yagman (*pro hac vice application forthcoming*)

ELLZEY KHERKHER SANFORD
MONTGOMERY LLP
4200 Montrose Street, Suite 200
Houston, TX 77006
TKherkher@EKSM.com
JEllzey@EKSM.com
LMontgomery@EKSM.com

*Attorneys for Plaintiffs and the Proposed Class*

# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF WASHINGTON
## SEATTLE DIVISION

| | |
|---|---|
| TED ENTERTAINMENT, INC., MATT FISHER, and GOLFHOLICS, INC., each individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>AMAZON.COM, INC., a Delaware Corporation<br><br>Defendant | Case No.: 2:26-cv-01134<br><br>**FIRST AMENDED CLASS ACTION COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

FIRST AMENDED CLASS ACTION COMPLAINT

Plaintiffs Ted Entertainment, Inc., Matt Fisher, and Golfholics, Inc. (collectively, where appropriate "Plaintiffs"), each individually and on behalf of all others similarly situated, by and through their undersigned counsel, file this Complaint against Defendant Amazon.com, Inc. ("Defendant") for violations of the Digital Millennium Copyright Act ("DMCA"), 17 U.S.C. §1201. The allegations contained herein are as follows:

**NATURE OF THE ACTION**

1. This is a nationwide class action for violations of the DMCA's anti-circumvention provisions, 17 U.S.C. § 1201(a), arising from Defendant unlawfully circumventing technological measures to access and scrape millions of copyrighted videos from the online video viewing platform, YouTube, in order to feed, train, improve, and commercialize Defendant's large-scale generative artificial intelligence ("AI") models and products, including its commercialized text-to-video model "Nova Reel" and the broader family of generative AI models, generative video-understanding architectures, and AI services that Defendant has developed, deployed, and monetized across its for-profit enterprise (collectively, "Amazon's AI Products").

2. Nova Reel is an artificial intelligence system designed by Defendant to generate video output from text and image input. This "text-to-video" and "image-to-video" system is intended to allow consumers to generate videos using text and image prompts.

3. Nova Reel is a text-to-video AI model conceived and marketed as Amazon's dedicated video generation platform. Amazon Nova Reel is commercially available through Amazon Bedrock, Amazon's managed AI services platform, where Amazon charges enterprise customers per second of video generated. Amazon Nova Reel was developed by Amazon AGI, the artificial general intelligence division of Amazon.com, Inc., and was publicly launched in December 2024 as part of the Amazon Nova family of commercial foundation models.

4. The technology Defendant has and continues to develop is now a core feature of the commercial AI products and services Defendant offers to its customers. Through Amazon Bedrock and related offerings, Defendant's enterprise customers can leverage this capability, which turns text or a static image into a video, for which Defendant charges on a per-use basis.

5. YouTube allows the public to view audiovisual works only through controlled

FIRST AMENDED CLASS ACTION COMPLAINT

streaming and never provides access to the underlying video files. YouTube does not provide public access to the underlying audiovisual works themselves, but instead delivers those works through a controlled streaming architecture that includes technological protection measures ("TPMs") which require the application of authorized processes, including tokenized requests, segmented delivery protocols, and player-based reconstruction.

6.    Defendant intentionally bypassed those restrictions by deploying tools designed to evade YouTube's TPMs. Defendant deployed automated systems that replicated and manipulated authorized request flows while evading enforcement mechanisms, effectively picking the digital lock that prevented access to the works in a form not available to the public and outside the conditions authorized by the copyright owners.

7.    On information and belief, Defendant used a video-downloading program combined with virtual machines that rotated IP addresses to avoid detection and blocking. Defendant used Plaintiffs' and Class Members' intellectual property for its own commercial gain. In doing so, Defendant has violated YouTube's Terms of Service, which were intended to protect Plaintiffs and others similarly situated.

8.    By accessing, scraping, and downloading those files to build Amazon's AI Products, Defendant deliberately circumvented YouTube's access controls.

9.    Plaintiffs and the Class Members whom Plaintiffs seek to represent are content creators who upload their audiovisual content to YouTube. On information and belief, the audiovisual content of Class Members was among the video content used by Defendant to train Nova Reel and related generative AI models.

10.    In uploading content to YouTube, the content creators are authorizing and instructing YouTube to provide protection to the video content through YouTube's anti-circumvention software and Terms of Service. In fact, YouTube's anti-circumvention software and protective Terms of Service are a driving factor behind content creators' decision to upload their video content to YouTube.

11.    Rather than seek permission or pay a fair price for the audiovisual content hosted on YouTube, Defendant harvested content creators' protected and copyrighted videos at scale without

consent or compensation.

12.    Defendant's actions were not only unlawful, but an unconscionable attack on the community of content creators whose content is used to fuel the multi-trillion-dollar generative AI industry without any compensation.

13.    Content creators such as Plaintiffs and the Class Members will never be able to claw back the intellectual property unlawfully copied and used by Defendant to train its generative AI. Once AI ingests content, that content is stored in its neural network, and not capable of deletion or retraction. Defendant's actions constitute abuse and exploitation of content creators' work for Defendant's profit.

14.    Most YouTube videos are not registered with the U.S. Copyright Office. That lack of registration, however, does not render them valueless or leave them unprotected. Content creators invest time, skill, and resources into producing their works, and they rely on YouTube's technological protection measures to safeguard their files from unauthorized access. Because copyright registration is not a prerequisite for protection against unlawful circumvention of access controls, this claim is especially critical where Defendant's misconduct lies in breaking through access barriers that prevent anyone from obtaining the underlying files in the first place.

15.    It is also critical to protect a flourishing internet ecosystem. In a world where Defendant and others can circumvent technological protections to exploit copyrighted works without authorization with impunity, creators will be less likely to make their creations available on YouTube and other similar platforms, for fear of losing all control of them. The world will be poorer for it.

16.    An essential component of Defendant's business model—powering AI features and services with large-scale training data—includes the mass acquisition and ingestion of creators' videos scraped from YouTube.

17.    Defendant has benefitted substantially from its infringement of Plaintiffs' and Class Members' video content through Defendant's training of its generative AI products.

18.    Plaintiffs bring this class action on behalf of themselves and on behalf of a nationwide class of YouTube creators whose works were scraped, ingested, and trained on without

authorization, seeking statutory damages, injunctive relief, restitution, and all other remedies allowed by law pursuant to the DMCA § 1201(a) seeking an injunction and damages commensurate with the scope of Defendant's massive and ongoing infringement.

## THE PARTIES

19.    Plaintiff Ted Entertainment, Inc. ("TEI"), is an independent California based media company and content creator with over 5,800 original videos on YouTube, with a combined total of over 4 billion views. TEI has amassed a substantial following on YouTube with over 2.6 million subscribers to its channels. TEI owns and operates the channels "h3h3 Productions" and "H3 Podcast Highlights." H3H3 Productions appears with at least 189 videos in YT-Temporal-1B. H3 Podcast Highlights appears with at least 743 videos in YT-Temporal-1B. Plaintiff invested significant resources – time and money – into producing and publishing this video content and bringing awareness to its content.

20.    Plaintiff TEI is the creator of original video works uploaded exclusively to YouTube by TEI, through which TEI derives value via viewership, advertising, sponsorships, licensing, and related monetization.

21.    Plaintiff TEI and its owners – Ethan and Hila Klein – are longtime champions of the rights of YouTube creators. The Kleins helped define what constitutes fair use reaction videos and the good faith belief standard for DMCA counternotifications. Plaintiff TEI has championed online free speech and is currently helping define what reaction content does not constitute fair use to ensure YouTube content creators can enjoy the fruits of their labor.

22.    Plaintiff Matt Fisher is an individual and resident of the State of California.  He is a golf content creator who posts his original videos on YouTube, many of which are instructional. His channel is "MrShortGame Golf" on the YouTube platform.  He has over 500,000 subscribers and hundreds of millions of views.  Plaintiff has invested substantial time and money into bringing awareness around his content. MrShort Game appears with at least 3 videos in YT-Temporal-1B.

23.    Plaintiff Matt Fisher is the creator of original video works uploaded exclusively to YouTube by Matt Fisher, through which Matt Fisher derives value via viewership, advertising, sponsorships, licensing, and related monetization.

24.     Plaintiff Golfholics is a corporate entity organized pursuant to the laws of the State of California. It is a golf content channel that posted its original videos on YouTube. The channel is "Golfholics" on the YouTube platform. It has over 130,000 subscribers and millions of views. Plaintiff invested substantial time and money into bringing awareness around its content. Golfholics appears with at least 121 videos in YT-Temporal-1B.

25.     Plaintiff Golfholics is the creator of original video works uploaded exclusively to YouTube by Golfholics, through which Golfholics derives value via viewership, advertising, sponsorships, licensing, and related monetization.

26.     Defendant Amazon.com Inc., is a Delaware corporation with its principal place of business at 410 Terry Avenue North, Seattle, WA 98109.

## JURISDICTION AND VENUE

27.     This Court has subject matter jurisdiction under 28 U.S.C. §§1332(d) (the Class Action Fairness Act) because the amount in controversy exceeds $5 million, exclusive of interest and costs, and a member of the Class is a citizen of a different state than Amazon. This Court also has subject matter jurisdiction under 28 U.S.C. §1331 because this action arises under 17 U.S.C. § 1201, et seq.

28.     The Court has supplemental jurisdiction over related state-law claims, if any, under 28 U.S.C. § 1367.

29.     Personal jurisdiction is proper because Defendant's principal place of business is in Seattle, Washington, and because Defendant transacts business nationwide, purposefully avails itself of this forum, and a substantial part of the events or omissions giving rise to these claims occurred or were directed here, including Defendant's targeting and use of servers based in the United States, including in Washington, to conduct its campaign to circumvent YouTube's TPMs.

30.     Venue lies in this judicial district pursuant to 28 U.S.C. § 1391(b)(1) and/or 1400(a) because Defendant resides in, is found in, or may be sued in this District, and a substantial part of the events giving rise to the claims occurred here.

31.     Plaintiffs reserve the right to refine jurisdiction and venue allegations after discovery and as additional facts become available.

FIRST AMENDED CLASS ACTION COMPLAINT

**FACTUAL BACKGROUND**

**A.     Plaintiffs and Class Members Create and Control Their Audiovisual Works on YouTube.**

32.     As noted above, Plaintiffs and the Class Members are independent content creators of audiovisual content.

33.     Plaintiffs and the Class Members create video content and upload their video content onto YouTube's video sharing platform.

34.     A YouTube creator retains continuous control over the visibility of each video and may change that visibility at any time. A creator may designate a video as "public," in which case it may be viewed by anyone and may appear in search results and recommendations; "unlisted," in which case it may be viewed only by those who have the video's URL and does not appear on the creator's channel or, by default, in YouTube's search results; or "private," in which case it may be viewed only by the creator and those whom the creator specifically invites. This visibility setting is a toggle that the creator may change at any time, and in any direction, after a video is uploaded. Through this control, the creator determines who may view the work and on what terms, and YouTube's technological protection measures operate to enforce the creator's chosen restriction.

35.     YouTube's "users"—the individuals who view the digital content available on YouTube—can watch and listen to videos for free on YouTube's advertising-supported service, but YouTube locks users from downloading copies of the work. In short, YouTube employs TPMs to ensure that users can view videos uploaded to YouTube only through the authorized playback mechanism.

36.     To enforce its prohibitions on downloading content, YouTube uses technological processes and tools to detect and block access to files for unauthorized downloading. For example, YouTube monitors downloading activity and blocks IP addresses that make too many download attempts in a specified period.

37.     YouTube has employed a variety of TPMs to restrict access to Plaintiffs' and the Class Members' audiovisual files. For example, YouTube does not provide users with a readily available downloading option and it has implemented a number of tools, such as the Rolling Cipher

6

and IP Blocking, that operate to restrict users' ability to access audiovisual material.

38.     Content creators, including Plaintiffs and Class Members, rely on the TPMs and YouTube's Terms of Service in deciding to upload their audiovisual content to YouTube. Content creators, including Plaintiffs and Class Members, expect that their works will not be copied at scale without consent.

**B.     YouTube Deploys Multiple Distinct TPMs that Control Access to the Underlying Video Files.**

39.     While YouTube permits members of the public to view audiovisual works through its platform, such permission is limited to access through YouTube's authorized playback environment and subject to the technological conditions imposed by its delivery systems.

40.     For example, YouTube does not authorize access to audiovisual works through automated extraction, direct retrieval of media streams, or reconstruction of works outside its controlled environment.

41.     YouTube does not provide users with direct access to audiovisual works in their native or fixed form. YouTube only delivers audiovisual works through a controlled streaming architecture that transmits segmented, time-limited portions of a work for ephemeral playback within YouTube's proprietary player environment.

42.     As a result, the complete audiovisual file is never made available as an intact, usable file on the viewer's device. When a user streams a video, YouTube continuously loads only short, sequential segments of the work into a temporary memory buffer, each segment retrieved through a separate authorized request and discarded after playback. At no point during ordinary streaming does the viewer's device hold the assembled work in a form the viewer can locate, open, copy, or export. The viewer experiences continuous playback, but the underlying file remains within YouTube's controlled delivery system and is never deposited "in the open" on the viewer's machine.

43.     Even in the limited circumstance in which YouTube authorizes a paying subscriber to save a video for offline viewing through its YouTube Premium service—for example, to watch on a flight—the underlying file is still never released in usable form. The content saved through

FIRST AMENDED CLASS ACTION COMPLAINT

that authorized feature is stored as encrypted, segmented data locked inside the YouTube application, tied to the specific device and account, and playable only through YouTube's own player. It does not appear in the device's file system as an ordinary, openable video file; it cannot be located, copied, transferred to another device, or played outside the YouTube application; and it remains subject to YouTube's control, including expiration if the subscription lapses or the device does not periodically reconnect to YouTube. At no point, whether through ordinary streaming or through this authorized offline feature, does YouTube hand the user an intact, unencrypted copy of the audiovisual file. Access to the work remains available only through YouTube and only through the application of YouTube's authorized processes.

44.    To protect against file level access, YouTube deploys multiple TPMs designed to control, restrict, and monitor access to the underlying video files and to deter extraction outside YouTube's controlled playback environment.

45.    These TPMs control how videos are delivered and accessed. For example, YouTube uses temporary, expiring links to send pieces of a video; breaks videos into small segments that must be put together in a specific way; checks and controls each request to make sure it follows the proper sequence; and requires the video to be assembled and played through YouTube's own player rather than accessed directly.

46.    In simple terms, YouTube doesn't just hand over a video file to every user seeking to view content. It sends the video in pieces, through temporary links, and only lets those pieces be put together and played using its own system, while checking each step along the way. This limits a user to streaming through YouTube's authorized streaming mechanism and locks a user out of the ability to download the audiovisual file.

47.    These measures function as access controls because they condition access to the audiovisual work on the application of authorized processes and prevent users from obtaining the work outside YouTube's controlled delivery system.

48.    Viewing a work on YouTube therefore requires the application of a sequence of authorized processes, including the issuance and validation of session-specific tokens, execution of player-side instructions, and reconstruction of segmented media streams into a continuous

8

audiovisual experience. The audiovisual work itself – *i.e.*, the complete, machine-readable embodiment of the work capable of being copied, processed, or analyzed – cannot be accessed by the public absent a means of bypassing or circumventing these specific controls.

49.    The TPMs specifically alleged here include, among others: (1) an obfuscated signature system commonly referred to as a "rolling cipher," (2) IP-based blocking and rate limiting that restrict high-volume automated access, (3) short-lived, session-bound streaming URLs, (4) CAPTCHA human-verification challenges triggered by automated activity, and (5) proof-of-origin tokens that verify requests originating from authorized client environments.

50.    Each TPM independently functions as a gatekeeping mechanism that must be circumvented before the audiovisual file can be retrieved, and circumvention of any one of them enables access to the file in a manner not authorized by YouTube or the owners of the content.

51.    Defendant accessed and obtained the audiovisual works themselves – not merely "files" distinct from those works – by reconstruction and assembling the protected media streams outside YouTube's authorized environment.

52.    Defendant exceeded any unauthorized access by obtaining audiovisual works through methods that bypassed the technological conditions placed on the video streams. Defendant's conduct therefore constituted access "without the authority of the copyright owner" within the meaning of 17 U.S.C. § 1201(a).

53.    Defendant employed automated systems and tools designed to bypass YouTube's TPMs by replicating and manipulating authorized request flows while avoiding enforcement mechanisms. These actions allowed Defendant to avoid, bypass, and impair technological measures that otherwise restrict access to audiovisual works, thereby constituting circumvention under 17 U.S.C. § 1201(a)(3)(A).

54.    **TPM (1) - Rolling cipher:** YouTube controls access to the underlying media file by withholding a usable file location unless the requesting client can transform an obfuscated signature parameter using proprietary logic embedded in the official YouTube player. The playback data delivered to users contains a scrambled signature that must be processed to produce a valid media request URL. Without performing this authorized transformation, the server will not deliver

the audiovisual file. Thus, the rolling cipher controls access by requiring application of a specific computational process before the file can be obtained at all.

55.    YouTube's rolling cipher encryption measure acts as a digital lock, controlling access to content by protecting against unauthorized access to the underlying media files. YouTube maintains two different URLs for any given video: the page URL, visible to the user, is for the webpage where the video playback occurs, and the file URL, not visible to the user, is for the video file itself that is played within the page. The file URL is encrypted using a complex and periodically changing algorithm – the rolling cipher – that is designed to impede external access to the underlying YouTube files. YouTube's player software uses a decryption routine to authenticate requests and deliver content only through approved interfaces. This TPM inhibits access to the underlying audiovisual files for the purposes of any downloading, copying or distribution of the audiovisual content. In other words, the rolling cipher controls access to copies of audiovisual content uploaded to the platform and impedes an ordinary user from creating a permanent, unrestricted download of audiovisual content made available on YouTube only for streaming and restricted downloading.

56.    The rolling cipher is a TPM measure within the meaning of 17 U.S.C. §1201(a) because it "effectively controls access" to copyrighted works by preventing users access to the files of video streams without first executing YouTube's proprietary decryption code.

57.    **TPM (2) - IP blocking and rate limiting:** YouTube monitors network behavior and restricts access when excessive or abusive request patterns are detected. When YouTube detects abnormal request volume originating from a particular IP address, it blocks that IP address from accessing the YouTube platform entirely. A blocked IP address cannot stream, browse, or retrieve any content from YouTube's servers. This mechanism conditions continued access to all content on the platform on compliance with YouTube's authorized access parameters and blocks certain types of users (those who are violated terms of service) from YouTube's website.

58.    YouTube's infrastructure monitors the number and frequency of requests originating from individual IP addresses against defined thresholds. Once those thresholds are exceeded, YouTube's servers cut off platform access from the offending IP address entirely,

preventing any further retrieval of audiovisual content from that source. This system serves a gatekeeping function that extends beyond any individual video or file. It controls whether a requester may access YouTube's content at all.

59.   **TPM (3) - Session-bound, short-lived URLs:** Even after a valid media URL is generated, YouTube restricts access by issuing URLs that are temporary, cryptographically signed, and tied to a particular playback session and client context. These URLs include authorization parameters such as expiration timestamps and client identifiers. Once the authorization window expires or the session ends, the server will refuse to deliver the audiovisual file in response to that URL. Accordingly, possession of a previously valid link does not provide continuing access to the file, and new authorization must be obtained to retrieve it. This mechanism therefore controls access by limiting when and from where the file may be requested.

60.   Because session-bound URLs expire automatically, any automated system attempting to access videos outside ordinary playback cannot rely on a static link and must instead repeatedly obtain fresh authorization parameters and regenerate valid media URLs. By programmatically renewing expired credentials and initiating new authorized sessions at machine speed, automated scraping tools can maintain continuous access to audiovisual files that would otherwise become unavailable once the original authorization lapses. This conduct circumvents the temporal and session-based restrictions imposed by YouTube and allows persistent retrieval of files in a manner not available to ordinary users. Circumventing this measure constitutes circumvention of a technological measure that effectively controls access to a copyrighted work in violation of 17 U.S.C. § 1201(a).

61.   **TPM (4) - CAPTCHA challenges:** When traffic patterns indicate automated or suspicious activity, YouTube typically requires completion of a CAPTCHA challenge before allowing further requests to proceed. CAPTCHAs are tests designed to separate human users from bots, often requiring identification of objects in grainy images. Until the challenge is successfully completed, the requesting client cannot stream the audiovisual work. CAPTCHAs therefore perform a gatekeeping function by prohibiting a certain type of user (a bot) from accessing the platform and the audiovisual works hosted on it.

62.    Large-scale scraping operations like Defendant's necessarily generate request patterns that trigger CAPTCHA challenges. Rather than completing those challenges, automated systems circumvent them by rotating IP addresses. IP rotation allows an automated system to abandon an IP address at the moment a CAPTCHA challenge is triggered and immediately resume platform access from a new IP address, bypassing the human-verification requirement entirely without ever responding to it. The new IP address presents to YouTube's servers as a fresh, undetected requester, allowing uninterrupted access to audiovisual content that YouTube's CAPTCHA mechanism was designed to gate.

63.    IP rotation therefore defeats both TPM (2) and TPM (4) through the same mechanism. When YouTube's IP-based monitoring system detects abnormal request volume and moves to cut off platform access, IP rotation prevents that access control from taking effect by substituting a new IP address before the block can be enforced. When YouTube's CAPTCHA system moves to verify human interaction, IP rotation bypasses that verification gate by escaping to a new IP address. In both cases, the circumvention is affirmative and technological. It is not mere disregard of a restriction, but active manipulation of the access environment to prevent YouTube's controls from operating as designed.

64.    At the scale required to compile datasets (such as YT-Temporal-1B) comprising hundreds of millions of video clips, IP rotation was not optional. YouTube's IP-based access controls and CAPTCHA enforcement would have halted any such operation long before completion absent systematic circumvention. The use of IP rotation at that scale constitutes circumvention of technological measures that effectively control access to copyrighted works in violation of 17 U.S.C. §1201(a).

65.    **TPM (5) - Proof-of-origin tokens:** YouTube further restricts access to its platform by requiring that all requests for video segments include cryptographic proof-of-origin tokens that validate the request as originating from an authorized YouTube playback environment. These tokens are generated dynamically by YouTube's official player software during an active, authenticated playback session. The token generation process ties each token to specific session parameters, including the client identity, the playback context, and a time-bounded authorization

window. YouTube's servers validate these tokens before delivering any audiovisual data. Requests that lack a valid token, present an expired token, or present a token generated outside an authorized playback context are refused. No audiovisual file data is delivered absent successful token validation.

66. Because proof-of-origin tokens are generated exclusively within YouTube's authorized player environment and are cryptographically bound to that environment, software operating outside that environment cannot obtain valid tokens through ordinary means. To retrieve audiovisual files at scale, automated scraping tools must affirmatively extract, replicate, spoof, or systematically reuse token parameters generated within authorized sessions. This requires the automated tool to interact with YouTube's player infrastructure specifically to harvest the credentials that YouTube's servers require before delivering content, and then to present those credentials outside the authorized context for which they were generated.

67. Descrambling tools such as yt-dlp are specifically designed to access, extract, and reuse these session-bound authorization parameters. By parsing YouTube's player response and extracting the token parameters required for server authentication, descrambling tools obtains and reuses credentials that YouTube's token system generates exclusively for authorized playback sessions. This allows descrambling tools to present valid-appearing proof-of-origin credentials to YouTube's servers while operating entirely outside the authorized playback environment those credentials were designed to authenticate. Without this extraction and reuse of token parameters, YouTube's servers would refuse to deliver the requested audiovisual files. Because YouTube's session-level anomaly detection can invalidate token generation for sessions exhibiting suspicious behavior, Defendant's IP rotation practices served the additional function of enabling continuous generation of new authorized sessions from which fresh proof-of-origin tokens could be harvested, allowing uninterrupted access to audiovisual file data at scale.

68. The proof-of-origin token system is a TPM within the meaning of 17 U.S.C. §1201(a) because it effectively controls access to copyrighted works by conditioning the delivery of audiovisual file data on cryptographic proof that the requester is operating within YouTube's authorized playback environment. Defendant's extraction and reuse of those tokens outside their

authorized context constitutes circumvention of a technological measure that effectively controls access to copyrighted works in violation of 17 U.S.C. §1201(a).

69. These technological protection measures were in place on YouTube at all times relevant to this Complaint, and Defendant could not have accessed the underlying video files referenced in the datasets without circumventing them.

**C.   YouTube's Terms of Service Reinforce their TPMs.**

70. YouTube's Terms of Service describe and reinforce YouTube's TPMs. YouTube's Terms of Service expressly prohibit scraping, unauthorized downloading, bulk extraction, or other forms of data mining of audiovisual content except through expressly permitted features or licensed APIs. These contractual restrictions operate together with YouTube's TPMs to prevent unlicensed access to creators' videos.

71. According to YouTube's Terms of Service, content creators such as Plaintiffs who upload content onto YouTube grant license to YouTube for certain uses as well as to other users of YouTube to view content through YouTube's services; however, the license makes clear that it "does not grant any rights or permissions for a user to make use of [the] Content independent of the Service."[1]

72. This language confirms that, while users may view (*i.e.*, stream) audiovisual works through YouTube's controlled environment, they are granted no other rights to use, exploit, or access the copyrighted works. YouTube's Terms of Service reflect YouTube's intent to use the TPMs described above to restrict access to the digital files underlying the videos that YouTube's users are allowed to stream through YouTube's platform.

73. Streaming through YouTube and downloading permanent copies provide the user with different value propositions—watching and listening for free but seeing ads, versus possessing a permanent digital copy.

74. In fact, during a Bloomberg interview about AI scraping, YouTube's CEO, Neal Mohan, confirmed that unauthorized scraping constitutes a violation of creators' rights and YouTubes Terms of Service stating, "From a creator's perspective, when a creator uploads their

---

[1] "Terms of Service," YouTube, https://www.youtube.com/t/terms (last viewed June 30, 2026).

hard work to our platform, they have certain expectations. One of those expectations is that the terms of service is going to be abided by," Mohan said, "It does not allow for things like transcripts or video bits to be downloaded, and that is a clear violation of our terms of service. Those are the rules of the road in terms of content on our platform."[2]

75.    The scraping and acquisition processes used by Defendant to circumvent YouTube's TPMs were inconsistent with, and in violation of, YouTube's Terms of Service, which forbid accessing video files, scraping, and mass downloading of videos.[3]

76.    To enforce its prohibitions on downloading content, YouTube does not provide a downloading option that is readily available to users.

77.    Although YouTube offers downloading options to subscribers who pay for YouTube's "Premium" plan, YouTube still employs TPMs to restrict access. Specifically, YouTube prohibits all downloading audiovisual content except to the YouTube app. Further, the "download" option only makes audiovisual content available for offline streaming—it does not provide the Premium subscriber with the ability to use the audiovisual file outside of this controlled environment. These controls are akin to encryption measures on a DVD that prohibit its use on unauthorized players. Accordingly, YouTube ensure the audiovisual files cannot be transferred to any other device, but remain only for streaming on the app. Finally, the files are available only for offline streaming for a limited amount of time, at which point they will become available only for online streaming once again.

78.    For users who do not have a "Premium" plan, the "download" option on YouTube's player page is non-functional.

79.    YouTube's Terms of Service and policies reinforce the variety of TPMs YouTube implements to restrict access to Plaintiffs' and Class Members' underlying audiovisual files.

---

[2] Davey Alba & Emily Chang, *YouTube Says OpenAI Training Sora With Its Videos Would Break Rules*, Bloomberg (Apr. 4, 2024), https://www.bloomberg.com/news/articles/2024-04-04/youtube-says-openai-training-sora-with-its-videos-would-break-the-rules (video available at https://www.youtube.com/watch?v=FBZ__BeChRg).

[3] *Supra*, note 1 (prohibiting "access, reproduce, download, distribute, transmit, broadcast, display, sell, license, alter, modify or otherwise use any part of the Service or any Content except: (a) as expressly authorized by the Service; or (b) with prior written permission from YouTube and, if applicable, the respective rights holders;").

FIRST AMENDED CLASS ACTION COMPLAINT

**D.** **Defendant Improperly Circumvented YouTube's Technological Protection Measures to Access and Obtain Millions of YouTube Videos to Train Its AI Models.**

80. As noted above, Defendant requires significant amounts of data to feed, train, improve, and commercialize Nova Reel, the text-to-video models created, owned and controlled by Defendant.

81. Without authorization, Defendant accessed Plaintiffs' and Class Members' audiovisual content from YouTube for use in its training data for Nova Reel. To do so, Defendant unlawfully circumvented YouTube's TPMs that YouTube implemented in its effort to impede the downloading of audiovisual content from its platform.

82. Amazon AI projects are not research tools or isolated projects; they are Defendant's attempt to commercialized foundational text-to-video AI models.

83. Because Amazon AI products are commercialized, Defendant had an overwhelming incentive to acquire training data on an unprecedented scale. Rather than negotiate for lawful licenses, Defendant broke through YouTube's access protections to access the underlying files needed to utilize the massive dataset necessary to fuel Nova Reel.

84. Defendant has sought to develop its AI products so it is capable of, among other things, turning language prompts into audiovisual content. In other words, Defendant has sought to, and has had success with, creating an AI product that accepts language instruction and produces a video based on that instruction.

85. With respect to Nova Reel, although Defendant has refused to identify their training data sources with specificity, their own Nova Reel System Card provides a critical admission. As Defendant stated: "we pre-train the FM using curated data from a variety of sources, including licensed and proprietary data, open-source datasets, and publicly available data where appropriate… Our development testing involves automated testing against publicly available and proprietary datasets, benchmarking against proxies for anticipated customer use cases, human evaluation of outputs against proprietary datasets, manual red teaming, and more.[4] Defendant thus

_____

[4] Amazon Nova Reel AI Service Card, AWS AI Service Cards, Amazon Web Services, (continued).

FIRST AMENDED CLASS ACTION COMPLAINT

admits that Nova Reel was trained on what the AI industry recognizes as "open source" and "publicly available datasets."

86.    Defendant's own published papers confirm that Defendant accessed and used the YouTube-sourced dataset YT-Temporal-1B. Because this dataset distributes only video identifiers and metadata rather than the underlying audiovisual files, Defendant's disclosed use of them necessarily required Defendant to obtain the referenced videos by downloading them directly from YouTube. While there is ample circumstantial evidence supporting a good-faith allegation that YT-Temporal-1B (or other YouTube-sourced datasets) was used to train Nova Reel, whether any such dataset was ultimately incorporated into Nova Reel is not necessary to Defendant's liability. The §1201(a) violation was complete at the moment Defendant improperly accessed the videos by circumventing YouTube's TPMs. At a minimum, Defendant used these YouTube-sourced datasets to develop, enhance, and commercialize the artificial intelligence capabilities of its for-profit enterprise, and the precise downstream models into which the unlawfully accessed content was fed is a matter within Defendant's exclusive knowledge that will be the subject of discovery.

87.    However, while the specific datasets ultimately incorporated into Nova Reel remain undisclosed and within Defendant's exclusive knowledge, Plaintiffs need not speculate as to the full scope of Defendant's AI projects to establish the circumvention at issue. Defendant's own published paper removes any need for speculation: Amazon's employees expressly disclosed that Amazon accessed and used the YT-Temporal-1B dataset, which required mass access to millions of YouTube videos that could be obtained only by circumventing YouTube's technological protection measures. What Defendant did bears no resemblance to the experience of an ordinary YouTube viewer. By running the dataset scripts to access, scrape, and download the referenced videos, Defendant pulled the actual, intact audiovisual files onto its own computers, where they had never resided until Defendant circumvented YouTube's access controls to obtain them. That extraction of the file itself—the very result YouTube's TPMs are designed to prevent—is the act that triggers liability.

88.    Amazon's paper *VidLA: Video-Language Alignment at Scale* identifies the source

https://docs.aws.amazon.com/ai/responsible-ai/nova-reel/overview.html (last visited March 31, 2026)

of its training videos as "YT-Temporal-1B," a YouTube-sourced dataset compiled by Rowan Zellers and other researchers at the University of Washington and the Allen Institute for Artificial Intelligence, and introduced in their 2022 paper describing a model called "MERLOT Reserve." YT-Temporal-1B references 20 million English-subtitled YouTube videos spanning approximately one billion extracted frames. Critically, the dataset does not contain the underlying audiovisual files. It contains only YouTube video URL identifiers and associated metadata, such as titles and descriptions. Its creators released only those identifiers and metadata, not the videos themselves.[5]

89.    Amazon used YT-Temporal-1B as the source for its own training corpus. In the *VidLA* paper, Amazon's employees state that they "utilize[d] 20 million videos from the YT-Temporal-1B [] dataset" to create a video-text dataset "since [it is] the largest collection of publicly available videos," and that, unlike prior works, Amazon used those videos to build a new derivative dataset it calls "YT-VidLA-800M."[6] Table 1 of the VidLA paper, captioned "Statistics of our curated training data set YT-VidLA-800M," reports that YT-VidLA-800M comprises 496 million short clips, 212 million medium clips, and 100 million long clips — approximately 808 million video-text pairs in total — every one of which was extracted from the 20 million YouTube videos Amazon obtained through YT-Temporal-1B.[7]

90.    Because YT-Temporal-1B contains only video identifiers and not the videos themselves, anyone seeking to actually use the dataset must independently go back to YouTube and access each referenced video file. The dataset's own documentation makes this explicit: it directs users to download the videos from YouTube using youtube-dl, a descrambling tool in the same family as the yt-dlp tool described above, and the creators acknowledge that their download script "[m]ainly . . . just calls YouTube-DL."[8] The instructions warn users to be cautious about their downloading activity stating, **"[i]f you don't wait enough between videos, you might get blocked by YouTube."**[9] In other words, the creators of YT-Temporal-1B built a dataset that cannot be used

[5]Mamshad Nayeem Rizve, Fei Fan, Jayakrishnan Unnikrishnan, Son Tran, Benjamin Z. Yao, Belinda Zeng, Mubarak Shah & Trishul Chilimbi, *VidLA: Video-Language Alignment at Scale*, arXiv:2403.14870 (Mar. 21, 2024), https://arxiv.org/pdf/2403.14870.
[6]*Id.*
[7]*Id.*
[8]Rowan Zellers, *download_youtube.py*, MERLOT Reserve GitHub Repository, https://github.com/rowanz/merlot_reserve/blob/main/data/download_youtube.py.
[9]*Id.*

18

without circumventing YouTube's TPMs, knew so, and published step-by-step instructions for doing so. Amazon used that dataset to build YT-VidLA-800M.

91.    YT-Temporal-1B does not contain the underlying audiovisual files. It contains only YouTube video identifiers and metadata such as titles and descriptions. Any user of the dataset must independently access, retrieve, and download each referenced video directly from YouTube, which necessarily requires circumventing the TPMs described above.

92.    The YT-Temporal-1B dataset consist of location identifiers that point to millions of YouTube videos or clips. None of them contains the underlying audiovisual files. To use them in training, a company must access, retrieve and download every referenced video directly from YouTube. Defendant used this dataset to initiate millions of individual downloads of protected YouTube content, all without authorization or compensation, all in violation of YouTube's TPMs, and all for the commercial purpose of building its foundational video models.

93.    Plaintiffs do not yet know the full extent of all datasets Defendant used to train Defendants commercialized AI text-to-video generation model and any derivative or successor models. The identity, contents, sources, and provenance of all training datasets are exclusively within Defendant's possession, custody, and control. On information and belief, Defendant used additional datasets beyond those publicly disclosed that incorporated YouTube-sourced content obtained through the same circumvention processes alleged herein. The full scope of Defendant's unlawful data acquisition, including any datasets, scraping pipelines, or third-party data purchases that incorporated YouTube-sourced content, will be the subject of discovery.

E.    **Defendant's Automated Scraping Required Circumvention of YouTube's Technological Protection Measures.**

94.    Bulk extraction of YouTube videos at the scale alleged here cannot occur without circumventing YouTube's layered TPMs, each of which independently controls access to the underlying audiovisual files. Illicit tools and services are specifically designed to defeat these protections, enabling automated systems to retrieve permanent copies of content that YouTube makes available only for streaming. This process is commonly known as "scraping" or "stream ripping." Under DMCA § 1201(a), circumvention of any single technological measure that

19

FIRST AMENDED CLASS ACTION COMPLAINT

effectively controls access to a copyrighted work is sufficient to establish liability; YouTube's protections are layered and overlapping, and the circumvention of one does not negate the effectiveness or legal significance of the others.

95.     "Scraping" or "stream ripping" content involves the automated downloading of audio and video files directly from a website's servers rather than viewing the content through the provider's authorized playback environment.

96.     Upon information and belief, in order to acquire "high-quality text-to-video generation," Defendant, directly and through agents, contractors, and affiliates, intentionally accessed large volumes of YouTube videos by scraping and/or using tools and workflows that bypass or evade YouTube's TPMs and usage restrictions, and then reproduced those videos to assemble training corpora for Defendant's AI models and services.

97.     When Defendant scraped audio and video files from YouTube, Defendant did not simply download those files onto the YouTube app for offline streaming, as envisioned by YouTube's Premium plan. Instead, Defendant improperly accessed the underlying audio and video files and downloaded those files into Defendant's own system, where Defendant had access over the files and where Defendant could store them indefinitely. These actions circumvented YouTube's TPMs, violated YouTube's Terms of Service, and are inconsistent with the access provided by YouTube's Premium plan.

98.     Upon information and belief, Defendant also obtained its own separate audiovisual datasets directly through its own independent scraping of YouTube's video sharing platform.

99.     To retrieve audiovisual files at scale, Defendant was required to defeat TPM (1), the rolling cipher that protects the true media file URL. On information and belief, Defendant used one or more descrambling tools designed to defeat YouTube's proprietary signature-transformation logic, allowing automated systems to generate valid file requests outside the authorized player environment and thereby obtain the underlying media files directly. Such tools include, for example, the open-source program yt-dlp, which is specifically engineered to descramble, replicate, or extract YouTube's proprietary signature-transformation logic and circumvent the access controls YouTube uses to prevent unauthorized downloading.

100.    A descrambling tool such as yt-dlp works by replicating or extracting the signature-transformation process that YouTube uses to protect its media URLs, allowing a user to bypass the authorized streaming environment entirely and retrieve the underlying video and audio files directly from YouTube's servers. Tools of this kind can be used to automatically merge separate audio and video streams and to download entire playlists at scale. On information and belief, Defendant used yt-dlp or a substantially similar descrambling tool for precisely this purpose.

101.    To deploy a descrambling tool such as yt-dlp, a user must first obtain and configure the program, along with ancillary software necessary to merge video and audio streams into complete audiovisual files. Once configured, the tool can be directed at individual videos or entire playlists by supplying the URL for each target video. The result is a complete audiovisual file retrieved outside of and in circumvention of YouTube's authorized playback environment.

102.    In simpler terms, a descrambling tool such as yt-dlp acts as a bootleg key for the lock imposed by YouTube's rolling cipher. On information and belief, Defendant used yt-dlp or a substantially similar tool to improperly access and download audiovisual files from YouTube and merge them into complete audiovisual packages for ingestion into their generative AI training pipeline.

103.    Defendant also defeated TPM (2), YouTube's IP-based monitoring and blocking system, which functions as a platform-wide access control. When YouTube detects automated activity from a particular IP address and blocks it, that IP address loses access to the entire YouTube platform. It cannot access, stream, browse, or retrieve any audiovisual content whatsoever. On information and belief, Defendant implemented an IP rotation scheme specifically to defeat this platform-wide access control. When YouTube detected automated activity and blocked one IP address, Defendant's operation immediately resumed from a new IP address, presenting to YouTube's servers as a fresh, undetected requester with full platform access restored.

104.    YouTube uses automated programs to monitor request volume and behavior from individual IP addresses, detect high-volume access patterns, and block those IP addresses from any further access to content on the platform. An IP rotation scheme is specifically designed to defeat this access control by cycling through different IP addresses to avoid detection and blocking before

21
FIRST AMENDED CLASS ACTION COMPLAINT

platform access can be terminated.

105. Executing an IP rotation scheme at the scale necessary to access the volume of files indexed in any one of the datasets used to train Nova Reel necessarily required the use of virtual machines or substantially similar infrastructure. A single physical machine with a fixed IP address would have been detected and blocked almost immediately given the volume of requests involved. On information and belief, Defendant deployed virtual machines, cloud computing infrastructure, or substantially similar technology to rotate IP addresses at scale, ensuring that when YouTube detected and blocked one address, Defendant's operation could immediately resume full platform access from another.

106. On information and belief, by repeatedly cycling through IP addresses in this manner, Defendant ensured that its automated operation could continue uninterrupted even after YouTube detected and blocked individual addresses. The sheer volume of videos in the dataset(s) necessary to train Nova Reel makes any alternative explanation implausible. The full details of the specific infrastructure Defendant used to execute this scheme will be the subject of discovery.

107. IP rotation was not merely a mechanism for circumventing TPM (2). It served as a unified circumvention method that defeated multiple TPMs simultaneously. Specifically, IP rotation also circumvented TPM (4) and supported circumvention of TPM (5), as described below.

108. Processes such as these allowed Defendant to bypass YouTube's player page and avoid YouTube's monitoring systems in order to access and scrape content from YouTube.

109. Defendant's conduct necessarily circumvented TPM (3), the use of session-bound, short-lived media URLs. Because these URLs expire and cannot be reused, automated tools must repeatedly obtain fresh authorization parameters and regenerate valid links to continue accessing files. By programmatically renewing access credentials outside ordinary playback sessions, Defendant maintained uninterrupted access to files that would otherwise become unavailable once the original authorization lapsed.

110. At scale, Defendant's automated activity would also trigger TPM (4), CAPTCHA challenges intended to condition continued platform access on proof of human interaction. Rather than completing those challenges, Defendant's infrastructure defeated them through IP rotation. At

the moment a CAPTCHA challenge was triggered against a particular IP address, Defendant's operation rotated to a new IP address, presenting to YouTube's servers as a fresh, undetected requester and bypassing the human-verification requirement entirely without ever responding to it. This is not passive disregard of a restriction. It is affirmative technological manipulation of the access environment that prevented YouTube's CAPTCHA controls from operating as designed. Defendant's infrastructure thereby obtained continuous access to audiovisual content without the human interaction that YouTube requires for continued platform access.

111.    IP rotation further supported Defendant's circumvention of TPM (5), YouTube's proof-of-origin token system. Because YouTube's session-level anomaly detection can invalidate token generation for sessions exhibiting suspicious behavior, Defendant's IP rotation practices enabled continuous generation of new authorized sessions from which fresh proof-of-origin tokens could be harvested. By rotating to a new IP address whenever session-level anomaly detection threatened to cut off the token supply, Defendant ensured uninterrupted access to the valid credentials required to obtain audiovisual file data from YouTube's servers.

112.    Defendant further circumvented TPM (5) by extracting, replicating, or reusing proof-of-origin token parameters outside the authorized playback environment for which they were generated. YouTube's proof-of-origin token system requires requests for video segments to present credentials demonstrating that they originate from an authorized playback environment. Automated downloading tools operate outside that environment and therefore must access, extract, replicate, or reuse the necessary request parameters to retrieve video data directly. By presenting those credentials outside their intended context, Defendant accessed and obtained audiovisual files that YouTube's token system was designed to deliver only to approved clients.

113.    Defendant knew or should have known its conduct violated YouTube's TPMs.

114.    Defendant's actions constitute a violation of the DMCA's anti-circumvention provisions, which state, among other things, that "[n]o person shall circumvent a technological measure that effectively controls access to a work protected under this title." 17 U.S.C. § 1201(a)(1)(a).

FIRST AMENDED CLASS ACTION COMPLAINT

**F.      Defendant's Actions Caused Harm to Plaintiffs and Class Members**

115.    At no time did Defendant seek or obtain Plaintiffs' or Class Members' authorization to access and use the videos Defendant used to train its generative AI models.

116.    At no time did Defendant seek or obtain Plaintiffs' or Class Members' authorization, nor did Defendant compensate Plaintiffs or the Class Members for the access, copying, ingestion, and use of their YouTube videos in AI training and related workflows.

117.    Plaintiffs and Class Members used YouTube as their platform of choice to upload their video content in substantial part due to YouTube's protective measures, including TPMS and Terms of Service that prohibit the type of scraping, unauthorized accessing and downloading, bulk extraction, and other forms of data mining of audiovisual content utilized by Defendant to obtain Plaintiffs' video content.

118.    Plaintiffs and Class Members suffer concrete and particularized economic injuries that are distinct from the bare statutory violation. These injuries take six independent forms, each of which is sufficient to establish Article III and statutory standing.

119.    First, Plaintiffs and Class Members who participate in YouTube's Partner Program lost per-view advertising revenue that YouTube's monetization system would otherwise have generated. YouTube's advertising model operates as follows: viewers who access content through YouTube's authorized streaming environment without a Premium subscription are served advertisements; YouTube remits a share of the resulting advertising revenue to content creators. Each authorized stream by a non-Premium viewer generates a monetizable advertising impression that feeds this revenue-sharing system. Stream ripping extracts the underlying video file entirely outside YouTube's authorized playback environment. When Defendant accessed Plaintiffs' videos by circumventing YouTube's TPMs, those retrievals generated no advertising impressions and no advertising revenue for Plaintiffs and Class Members. The economic value that Plaintiffs and Class Members would have received had Defendant engaged in any authorized form of access, including licensing the content directly, was instead extracted at zero cost.

120.    Second, Plaintiffs and Class Members lost YouTube Premium revenue that YouTube's subscription monetization system would otherwise have generated. When a viewer

accesses content through YouTube's authorized streaming environment as a YouTube Premium subscriber, no advertisement is served. Instead, YouTube shares a portion of the viewer's monthly membership fee with the creator, compensating the creator for the view in lieu of advertising revenue.[10] YouTube Premium thereby gives creators a secondary revenue stream in addition to advertising revenue. This revenue is allocated based on watch time: YouTube distributes Premium membership revenue to creators based on how much watch time they earn from Premium subscribers. Creators collectively receive 55% of YouTube Premium subscription revenue, with individual payouts determined by each channel's share of total Premium watch time. Because Defendant accessed Plaintiffs' content entirely outside YouTube's authorized streaming environment, no Premium watch time was recorded and no Premium subscription revenue was allocated to Plaintiffs or Class Members. Every video retrieved by Defendant through circumvention of YouTube's TPMs represents a loss of both advertising revenue and Premium subscription revenue that authorized access would have generated.

121.    Third, Plaintiffs and Class Members who had not yet qualified for YouTube's Partner Program at the time of Defendant's conduct suffered direct economic injury to their monetization prospects. YouTube conditions Partner Program eligibility on a channel accumulating minimum thresholds of watch hours and subscribers. Each view generated through YouTube's authorized streaming environment counts toward satisfying those thresholds and carries direct, measurable economic value as progress toward monetization eligibility. Because Defendant accessed Plaintiffs' content through automated tools that bypassed YouTube's streaming infrastructure entirely, no view count was registered and no watch time accumulated. Plaintiffs and Class Members were thereby deprived of view counts and watch hours that would otherwise have contributed to Partner Program qualification, delaying or impairing their ability to monetize their channels.

122.    Fourth, all Plaintiffs and Class Members, regardless of monetization status, suffered economic injury through the loss of algorithmic amplification. YouTube's recommendation algorithm uses view counts, watch time, and engagement metrics to determine which videos to

---

[10] YouTube, *How YouTube Premium supports creators*, Google Support, https://support.google.com/youtube/answer/7060016?hl=en (last visited April 9, 2026).

FIRST AMENDED CLASS ACTION COMPLAINT

surface to new audiences. Legitimate streaming views generate algorithmic signals that drive organic channel growth, subscriber acquisition, and expanded audience reach, each of which translates directly into economic value for the content creator. Because Defendant's automated tools bypassed YouTube's streaming infrastructure entirely, no view count was registered, no watch time accumulated, and no algorithmic signal was generated. Plaintiffs and Class Members were thereby deprived of the organic growth, subscriber acquisition, and expanded monetization potential that legitimate streaming of the same content would have produced. This injury extends to every Class Member who uploaded content to YouTube, regardless of whether their channel was enrolled in the Partner Program at the time of Defendant's conduct.

123. Fifth, Defendant's conduct also caused concrete harm to the market for Plaintiffs' and Class Members' content. Instead of seeking to purchase a copy of the audiovisual file from the Plaintiffs and members of the Class, Defendant choose to illegally download a copy free, by bypassing the technological protection measures preventing such access on YouTube's platform.

124. Sixth, Plaintiffs and Class Members suffered injury in the loss of control of their works. The DMCA's purpose, in large part, was to encourage content creators to make their works available on the internet without fear of losing total control over them, as the loss of control over digital files embodying copyrighted works—e.g., the audiovisual files at issue here—effectively undermines any ability to ensure that they are fairly compensated for exploitation of their works. That is especially true here, where Defendant ripped their audiovisual files, retains copies of them, and yet Plaintiffs and the Class have no visibility into how and for what purpose Defendant continues to exploit their copyrighted content without any compensation.

125. As a direct and proximate result of Defendants' circumvention, Plaintiff has suffered actual damages, including loss of control over his copyrighted works, impairment of market value, and costs incurred to identify, remove, and prevent further distribution of the infringing content.

## **TOLLING**

126. The statute of limitations for claims under 17 U.S.C. § 1201 is three years from the date the claim accrued. *See* 17 U.S.C. § 1203(c). A claim under § 1201 accrues when the circumvention occurs, that is, when the defendant actually retrieves protected content by defeating

the applicable technological protection measures.

127.    The datasets identified herein contain no audiovisual files—only references to such audiovisual files. No circumvention therefore occurred when any such dataset was published. The actionable conduct is Defendant's subsequent use of each dataset to access, stream rip, and download the referenced videos directly from YouTube. That circumvention occurred when Defendant retrieved each video file, and each such retrieval constitutes a separate act of circumvention. The date of publication of any dataset is therefore legally irrelevant to accrual. To the extent any act of circumvention falls within the three-year period preceding the filing of this complaint, this action is timely on its face. To the extent any act of circumvention predates that period, the limitations period is independently tolled as alleged below.

128.    Because Defendant kept its accessing and scraping of YouTube videos a secret, Plaintiffs and Class Members could not have known of Defendant's conduct despite their reasonable diligence in investigating their claims. The technical process by which AI training materials are compiled, and the act of retrieving the underlying files through circumvention, are not information available through ordinary inquiry by content creators. Defendant possessed, and continues to possess, exclusive knowledge of the specific tools, infrastructure, and processes it used to retrieve audiovisual files from YouTube.

129.    The doctrine of fraudulent concealment independently tolls the limitations period. The identification of a specific dataset, or even video URLs contained within a specific dataset, does not place a plaintiff on inquiry notice of a circumvention claim. The circumvention act is the retrieval of the files, and, as alleged above, Defendant has concealed the tools, infrastructure, and methods it used to defeat YouTube's TPMs, and that concealment prevented Plaintiffs and Class Members from discovering the facts necessary to assert a claim.

130.    The publicly available versions of the datasets at issue contained only video identifiers, URLs, and metadata—not the underlying audiovisual files—and did not identify content creators by name, channel, or any other human-readable identifier. No individual content creator could reasonably be expected to audit every paper published by a technology company, nor to access each of the millions of URLs in a dataset to determine whether any particular video is the

creator's own work. Plaintiffs and Class Members had no direct contact or interaction with Defendant and no means from which they could have discovered the facts concerning Defendant's circumvention.

131.    Because Defendant affirmatively concealed its conduct, Plaintiffs and Class Members had no knowledge of the alleged conduct, or of any facts that would have caused a reasonably diligent person to investigate whether Defendant circumvented YouTube's TPMs, until, at the earliest, March 21, 2024, when Amazon employees first publicly disclosed in the VidLA paper that Amazon had used the 20 million videos from YT-Temporal-1B to construct its YT-VidLA-800M training corpus.

## CLASS ACTION ALLEGATIONS

132.    Plaintiffs bring this action on behalf of themselves and on behalf of all other persons similarly situated.

133.    Plaintiffs propose the following Class definition, subject to amendment as appropriate:

> **All persons and entities whose videos were posted on YouTube and that Defendant accessed at the file level by scraping, downloading, or otherwise extracting underlying video files from YouTube.**

134.    Excluded from the Class are Defendant; any affiliate, parent or subsidiary of Defendant; any entity in which Defendant has a controlling interest; any officer, director, or employee of Defendant; any successor or assign of Defendant; anyone employed by counsel in this action; any judge to whom this case is assigned, his or her spouse and immediate family members; and members of the judge's staff.

135.    Plaintiffs reserve the right to modify the class definition or add sub-classes as needed prior to filing a motion for class certification.

136.    The proposed Class meets the criteria for certification under Rule 23 of the Federal Rules of Civil Procedure.

137.    <u>Numerosity</u>. The Members of the Class are so numerous that joinder of all of them

is impracticable. The exact number of Class Members is unknown to Plaintiffs now, but Plaintiffs estimate that there are thousands of Class Members.

138.   Commonality. Questions of law and fact common to the Class Members predominate over questions that may affect only individual Class Members because Defendant has acted on grounds generally applicable to the Class. Such generally applicable conduct is inherent in Defendant's wrongful conduct. The following questions of law and fact are common to the Class:

a.   Whether YouTube employs TPMs that "effectively control access" to copyrighted audiovisual works within the meaning of 17 U.S.C. §1201(a);

b.   Whether Defendant's defeated, avoided, bypassed, removed, deactivated, impaired, or otherwise circumvented YouTube's TPMs, including through automated tools to download or otherwise obtain unauthorized access to the Plaintiffs' and Class Members' copyrighted content on YouTube;

c.   Whether Defendant's circumvention and/or trafficking conduct was willful, knowing, and undertaken for commercial advantage or private financial gain; and

d.   Whether Defendant retrieved, scraped, downloaded, or otherwise acquired the underlying YouTube videos referenced in YT-Temporal-1B and any other datasets used by Defendant at massive scale to build training material for its AI systems.

139.   Typicality. Plaintiffs' claims are typical of those of other Class Members because Plaintiffs' video content, like that of every other Class Member, was made available on YouTube and improperly altered and used by Defendant to train Defendant's generative AI models for commercial purposes. Plaintiffs' claims are typical of those of the other Class Members because, among other things, all Class Members were injured through the common misconduct of Defendant. Plaintiffs are advancing the same claims and legal theories on behalf of themselves and all other Class Members, and no defenses are unique to Plaintiffs. Plaintiffs' claims and those of Class Members arise from the same operative facts and are based on the same legal theories.

140.   Adequacy of Representation. Plaintiffs will fairly and adequately represent and protect the interests of the Members of the Class. Plaintiffs' interests coincide with, and are not antagonistic to, those of the Class Members. Plaintiffs are represented by attorneys with experience

in the prosecution of class action litigation. Plaintiffs' attorneys are committed to vigorously prosecuting this action on behalf of the Class Members.

141.   Predominance. Defendant has engaged in a common course of conduct toward Plaintiffs and Class Members, in that Plaintiffs' and Class Members' video content was unlawfully accessed, downloaded, altered and used by Defendant in the same way. Defendant's conduct was uniform across the Class: every video unlawfully accessed from YouTube was ingested into the same core model that underpins Defendant's product ecosystem. This commonality further demonstrates the predominance of shared legal and factual issues among Class Members. The common issues arising from Defendant's conduct affecting Class Members set out above predominate over any individualized issues. Adjudication of these common issues in a single action has important and desirable advantages of judicial economy.

142.   Superiority. A Class action is superior to other available methods for the fair and efficient adjudication of the controversy. Class treatment of common questions of law and fact is superior to multiple individual actions or piecemeal litigation. Absent a class action, most Class Members would likely find that the cost of litigating their individual claims is prohibitively high and would therefore have no effective remedy. The prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications with respect to individual Class Members, which would establish incompatible standards of conduct for Defendant. In contrast, the conduct of this action as a class action presents far fewer management difficulties, conserves judicial resources and the parties' resources, and protects the rights of each Class member.

143.   Defendant has acted on grounds that apply generally to the Class as a whole, so that class certification, injunctive relief, and corresponding declaratory relief are appropriate on a Class-wide basis.

144.   Ascertainability. Finally, all members of the proposed Class are readily ascertainable. Defendant used a dataset that contain the full lists of URLs and video identifiers for every YouTube video incorporated into the training pipeline. Those identifiers allow the parties to determine exactly which videos were used and to match each video to its creator through

YouTube's public channel and authorship information. Because the dataset provides a complete map of the videos Defendant downloaded, the identities of the affected creators are identifiable through straightforward reference to the URLs and corresponding channel data.

## CLAIMS FOR RELIEF

### *Violation of the DMCA (Anti-Circumvention) 17 U.S.C. § 1201(a)*

145.    Plaintiffs repeat, reallege, and incorporate the allegations contained in the previous paragraphs as if fully set forth herein.

146.    Plaintiffs and Class Members are owners of YouTube channels that uploaded copyrighted audiovisual works that they own and/or license and are publicly performed through the YouTube platform (collectively, the "Videos"). Plaintiffs and Class Members own all rights, title, and interest in and to the claims asserted in this action, including all claims for violation of 17 U.S.C. §1201.

147.    YouTube employs TPMs that effectively control access to Plaintiffs' and Class Members' Videos within the meaning of 17 U.S.C. §1201(a)(3)(B). YouTube's TPMs prohibit scraping, unauthorized downloading, bulk extraction, or other forms of data mining of audiovisual content.

148.    These TPMs require the application of information, processes, and authorized interactions to access the audiovisual works in usable form. These measures function to prevent access to Plaintiffs' Videos outside YouTube's authorized delivery environment. These restrictions prevent access to the underlying video files, not simply reproduction of content.

149.    When each of Plaintiffs' and Class Members' Videos were published to YouTube, YouTube automatically applied TPMs that control access to and prevent unauthorized access to these audiovisual files. YouTube's TPMs exist for the explicit purpose of preventing unauthorized access to creator content and are deployed on behalf of, and for the benefit of, Plaintiffs and the Class members. That YouTube operates the technical infrastructure implementing the TPMs does not diminish the protection those measures provided to Plaintiffs and Class Members.

150.     Plaintiffs and Class Members are the parties whose Videos were accessed without authorization and whose rights the DMCA's anti-circumvention provisions were designed to protect. Permitting Defendant to escape liability under § 1201 simply because Plaintiffs and the Class Members delegated technical implementation of access controls to YouTube would gut the statute's protections for every creator who relies on a third-party platform to safeguard their work. The text of § 1201 does not support that result.

151.     Defendant knowingly and intentionally circumvented YouTube's TPMs by deploying automated systems designed to avoid, bypass, and impair those TPMs.

152.     Defendant used automated tools for the sole purpose of circumventing YouTube's access barriers and extracting files never made available to the public. In doing so, Defendant improperly obtained millions of videos from YouTube's platform.

153.     This distinction is critical: viewing a YouTube video through YouTube's platform does not provide access to the underlying file. Defendant's circumvention tools broke through that access barrier, triggering liability under §1201.

154.     Defendant's liability under §1201(a) was complete at the moment Defendant improperly accessed Plaintiffs' and Class Members' audiovisual files by circumventing YouTube's TPMs. The statute prohibits the act of circumventing a technological measure that effectively controls access to a protected work; it does not condition liability on what the circumventer subsequently does with the work it has unlawfully obtained. Accordingly, the question of whether any particular YouTube-sourced dataset or video was ultimately incorporated into Nova Reel or any other specific Amazon model is not an element of the violation. Whatever Defendant's ultimate use, the §1201(a) violation was complete when Defendant defeated YouTube's access controls and obtained the underlying files.

155.     Defendant's conduct constitutes circumvention because it involved the avoidance and bypassing of technological measures that control access to copyrighted works, without the authority of Plaintiffs or the Class Members.

156.     Multiple of the datasets contains no audiovisual files. It contains only URLs, video identifiers, and timestamps that identify where content is located on YouTube's servers. The dataset

functions as a map. The act of circumvention occurs when a user takes that map, accesses YouTube, defeats YouTube's access controls, and retrieves the actual files. Defendant performed each of those steps.

157. Defendant's use of the aforementioned datasets required Defendant to independently circumvent each of YouTube's TPMs for each of the over 100 million clips identified in the dataset. No circumvention was embedded in or transferred by the dataset itself. Stream ripping requires defeating YouTube's rolling cipher, navigating IP-blocking systems, regenerating session-bound URLs, bypassing CAPTCHA challenges, and replicating proof-of-origin tokens in real time at the moment of each retrieval. These are affirmative technical acts performed against YouTube's servers. Defendant performed each of them independently and directly.

158. Defendant's circumvention acts targeted YouTube's servers, including servers located within the United States and within this District. YouTube's content delivery infrastructure is headquartered and substantially operated in the United States. The TPMs at issue, including YouTube's rolling cipher, IP-blocking systems, session authentication, CAPTCHA enforcement, and proof-of-origin tokens, are implemented, maintained, and enforced from systems located within the United States. Every circumvention act Defendant performed was directed at U.S.-based servers and U.S.-operated technological systems. The relevant geographic inquiry is where YouTube's access controls were defeated, which is the United States.

159. Plaintiffs and Class Members have been harmed by Defendant's conduct because Defendant has unlawfully accessed and taken their Videos without authorization or compensation.

160. Defendant accessed, downloaded, stored and utilized those Videos to assemble training corpora for Defendant's AI models and services.

161. Each act of circumvention constitutes a separate violation of §1201. Plaintiffs and the Class Members are entitled to statutory damages, injunctive relief, impoundment, and attorneys' fees and costs under 17 U.S.C. §1203.

162. Each of Defendant's acts of infringement is a willful violation as Defendant specifically utilized automated tools designed to evade YouTube's TPMs.

FIRST AMENDED CLASS ACTION COMPLAINT

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request a judgment in their favor and against Defendant as follows:

A. Certification of this action as a class action and appointment of Plaintiffs and Plaintiffs' counsel to represent the Class;

B. Declare that Defendant has willfully circumvented the copyright protection systems of YouTube intended to protect Plaintiffs' and the Class Members's audiovisual content.

C. For statutory damages (up to the maximum allowed by law per violation), injunctive relief, and attorneys' fees and costs under 17 U.S.C. §1203;

D. For such equitable relief under Title 17, Title 28, and/or the Court's inherent authority as is necessary to prevent or restrain infringement of Plaintiffs' and the Class Members' copyright-protected content, including a preliminary and permanent injunction requiring that Defendant and its officers, agents, servants, employees, attorneys, directors, successors, assigns, licensees, and all others in active concert or participation with any of them, cease infringing, or causing, aiding, enabling, facilitating, encouraging, promoting, inducing, or materially contributing to or participating in the infringement of any of Plaintiffs' or the Class Members' exclusive rights under federal law;

E. For an award of pre-judgment and post-judgment interest, to the fullest extent available, on any monetary award made part of the judgment against Defendant; and

F. For such other and further relief as the Court may deem just and proper.

/ / /

/ / /

/ / /

## **JURY DEMAND**

Plaintiffs demand a trial by jury on all claims for which trial by jury is proper.

Dated: June 30, 2026

WASHINGTON INJURY LAW

By  /s/ JANELLE BAILEY
JANELLE BAILEY

**ELLZEY KHERKHER SANFORD
MONTGOMERY LLP**

TOM KHERKHER
JARRET LEE ELLZEY
LEIGH S. MONTGOMERY
TYLER YAGMAN

Attorneys for Plaintiffs

FIRST AMENDED CLASS ACTION COMPLAINT